Mr. Shackelford Yes, we'll hear from you first. You may proceed. Yes, your honor. Thank you. May it please the court, your honors, foes and counsel, I'm Jody Shackelford. I'm here for the appellant, Ms. Canary Reed. I'm proud to be here. This is a Title VII race discrimination case. It comes out of Remington's ammunition plant in Lone Oak, Arkansas. The district court granted summary judgment in this case and it committed the one error that Rule 56 forbids. It resolved genuinely disputed material facts and witness credibility against the non-moving party. And that was done by believing Remington's HR paperwork over Remington's own sworn witnesses. And for time, three main examples frame this appeal. First, the termination file falsely states that Canary Reed interrupted her supervisor, Conrad Yeckel, and yelled at a team lead, Travis Beeman. But Yeckel's sworn testimony says the opposite. Yeckel testified that Travis Beeman jumped into a conversation Reed was having with Yeckel and that Travis later apologized for doing so. Thus, the employer's stated basis for termination is contradicted by the testimony and says the opposite. And that's not a minor inconsistency, Your Honors. It completely reverses who did what. In second, Reed, the only black female in her unit, reported that four white co-workers were sabotaging her workspace. Her supervisor, Mr. Yeckel, his response was to ask those white men she accused and believed them. And under oath, and this is in Appendix 150, the question was, you took everybody's word but hers. His answer was yes. Her white counterpart, Nathan Rochelle, same title, same shift, same machines, admitted he fell asleep on the job more times than the photographs showed and never a single write-up. Ms. Reed was accused of sleeping and even with Nathan telling Remington that she was not sleeping, she got the write-up. And under Anderson and Reeves, those disputes belong to a jury, not a summary judgment order. So starting back with the incident where Remington labels in their report about this HR incident with Mr. Beeman and Yeckel, that she had aggression toward a supervisor. And that was the capstone of the termination decision. But Remington's own documents on page 70 reports that Travis was explaining the machine output when, quote, Canary interrupted and yelled at Travis. But Yeckel's deposition said the exact opposite story. The question was, so you were having a conversation with Canary. This was to Yeckel. And he says, yes, correct. Yeckel says Travis jumped into the conversation with him even saying, I'm not trying to be rude. And when asked if Travis went as far as to apologize, yet Yeckel conceded to some extent. And Yeckel described Travis as, quote, my wingman. Appendix 144 to 145. So Yeckel and his white wingman reported a false version of these events and used it to terminate her. The district court saw this conflict on page four of the order, acknowledging that plaintiff contends that Zeman interrupted her conversation with Yeckel, but then adopted the employer's version of this. And that's the error. Choosing between an HR narrative and the decision maker's sworn testimony is a credibility determination. And under Anderson and Tolan v. Cotton, that's reserved for the jury. The same is true for the performance file. Supervisor Chris Pence reported that machines weren't running all night, casting a dispersion on Ms. Reed. And looking at that, Rochelle, her partner, testified that Pence's statement was, quote, a lie. And that they had five machines running all night. And the sleeping write-up, issued April 12th, in the same window as the race complaint that Remington received, and they concede in their brief was the protected activity, the same supervisors who had received that complaint did nothing with it. An eyewitness, Rochelle, told supervisors at the same time that he didn't believe Reed was sleeping, and her explanation in the record was that she was placing medicated eye drops in. What did Remington do with that? Nothing. No follow-up with the witnesses. Yackel admitted she'd been, quote, found guilty before he even spoke with her. Even against Nathan Rochelle's statements that she was not sleeping. A process that convicts first, investigates nothing, is not an honest belief. It's the absence of one. The district court answered all of this with McCullough's honest belief doctrine. But on this record, the honest belief itself is the disputed fact. Under Reeves, a false explanation is not a side issue. It's evidence of discrimination. And the Supreme Court held that proof of an employer's stated reason being untrustworthy or unworthy of credence may itself be quite persuasive. Evidence that the real reason was unlawful discrimination. Mr. Shackelford, could you also address the issue of whether Ms. Reed's proposed comparator was similarly situated? I'm so sorry. You're on out of hearing. Say it one more time. Could you also address the question of whether Ms. Reed's proposed comparator co-worker was similarly situated? Yes, Your Honor. In the order, the lower court said that he wasn't situated because he didn't receive as many violations as she did within the same time frame. But, Your Honor, looking at the comparator, it's about the conduct. And he had the same job, same job title. They worked hand in hand. It would be hard to be more of a comparator than her exact co-partner in everything she did there. Was there evidence that the company had observed this co-worker sleeping and failed to act? No documentation. Or was there just evidence that he acknowledged that he did sleep from time to time? In his testimony, he said that he was sleeping more times than these photographs that we had at the deposition showed. But him not being documented for sleeping, that would mean that is all that they would ever have to do is take a preferred employee, not write down any violations they see, and then target somebody that they did want to give extra write-ups to. Is there evidence that they did that here? I don't want to get into a circle argument, but there's no evidence that they saw him and didn't write it up. There's no evidence of that. But there's no evidence that they didn't see him. I think that when it goes to that comparator evidence, they weren't writing him up. He was the white guy, and he didn't get any write-ups. And we don't know, and it says it's unclear in the order. And so I think that goes to, it's a fact determination question, and so being unclear, like the order says, it should go to the jury to decide. Her partner, Nathan Michelle, again, he had the same job. She had one disputed allegation, a formal reprimand, and it went into the termination file. And Yekel testified that when the two worked together, this is Nathan and her, responsibility was 50-50. But she was the only one that received write-ups. And in the deposition it says, if Michelle declines to accept responsibility, the quote was, it becomes 100% reads. When Yekel said it was 50-50 for the ring-mixing accident, the lower court relied on, Michelle received, that's what they relied on, and Michelle received nothing in that incident where he was working hand-in-hand with her during that event. The district court distinguished Michelle, again, because he lacked those successive violations, but that's built on their own selective paperwork. If admitted misconduct by the white technician is never documented, his file will always look cleaner. And the Riddell case holds comparators need not be clones. The question is comparable conduct. They abandoned their own policy. Ms. Reed had reported that she felt that they were being racist, and that was a report given to her supervisors. Nothing was done with it. Mr. Schmidt, a higher-up supervisor, said that, testified that the policy required statements, separation of employees, escalation, that HR handles the investigation, and race complaints go up immediately. But that never happened here. She made a race complaint, and absolutely nothing happened. On retaliation, protected activity is no longer in dispute. A police brief says that they do not dispute that she engaged in protected activity when she said that her report that they discarded a tool that she made was a racial move, and that causation runs straight through Yekel, who received the complaint and failed to follow up. A big thing is him explaining to HR a completely fabricated set of events against her and then use that to terminate her. That's not right. This case is rife with questions of fact that the court resolved wrongly against a non-moving party, and, Your Honors, that's why we ask for a reversal today. Thank you. All right. Thank you for your arguments. Ms. Poole, we'll hear from you. You may proceed. May it please the court. Pardon me. May it please the court. My name is Hannah Poole, and I represent the Kinetic Group and Remington Ammunition. I have a statement prepared, but first I'd like to address the majority of points Appellant's counsel raised that the record does not support. I'll begin where he began. Appellant's counsel claimed that the district court resolved genuinely disputed material facts in Remington's favor. That's simply not true. Appellant's brief and opposing counsel's argument relies heavily on an assertion that plaintiff's termination file falsely states that Reed interrupted his supervisor, Travis Zeman, in a heated conversation days before her termination. Whether Reed interrupted Zeman or whether there was an interruption at all is immaterial. The undisputed record shows that Appellant was very aggressive with his supervisor, that she got in his face, that her other supervisor, who was in the room, asked her to calm down, to apologize, and that she refused to do so. This aggressive behavior toward his supervisor is what ultimately led to her termination, not that she may have interrupted his supervisor while he was speaking. Further, Appellant's counsel claims that Appellant's counsel claims that she reported that her coworkers were sabotaging her workspace. This is not the case. She reported that one of her coworkers discarded a handmade tool that she had created to work on machines in Remington's rotary camp department. It's undisputed that plaintiff's supervisor investigated this allegation and concluded that it was unsubstantiated. It's also undisputed that Appellant's supervisor advised Appellant that creating handmade tools for use on Remington's machines is against policy. These machines are highly safety sensitive, and using a handmade tool might bring a machine out of specification and lead to a hydraulic fluid leak or, even worse, an explosion. Further, I'd like to speak on Ms. Reed's coworker, Nathan Reichel, who's not similarly situated. As you pointed out, Judge Colleton, the company has absolutely no record of anyone in supervision observing Mr. Reichel sleeping on the job. Ms. Reed took a photo of Reichel, or maybe a series of photos of Reichel sleeping on the job, but Mr. Yuckel testified and Mr. Reichel testified that those photos never made their way to anybody in supervision. Contrasting that with Ms. Reed's write-up for sleeping, a maintenance worker photographed Ms. Reed sleeping on her shift. That photo made its way to the supervisor on the shift, who then investigated immediately. Ms. Reed was nudged multiple times while she was sleeping on her shift and did not wake up. That is how the company knows that she was sleeping. There's no credibility determination to be weighed here. The fact that Ms. Reed days later claimed that she might have been putting in eye drops does not tend to suggest that the fact that she was not awoken when she was nudged means that she was not sleeping. How many reports of sleeping were there about Reed? Just the one? Just the one in the record, Your Honor. Moving forward to Appellant's assertion that her co-worker Reichel testified that machines were not running all night. This relates to one of the three write-ups that occurred in rapid succession in the two weeks before her termination. Ms. Yuckel and her co-worker, Mr. Reichel, worked the night shift from 7.30 p.m. to 7.30 a.m. On the night in question, Mr. Reichel left around 12.30 a.m. He testified that when he left, all of the machines in the department were running. He does not know, as he testified, whether all of the machines in the department were running after he left. In fact, Ms. Reed spoke with a supervisor and claimed, I couldn't keep all the machines running on that shift because I was too busy attending to my other three machines. Company policy is that when one employee is working alone in the rotary cam department, they are responsible for ensuring all of the machines in the department are running. Just to remind the court, appellant was terminated for a series of policy violations and misconduct she committed in the two weeks preceding her termination. Those series of policy violations are, number one, failing to repair a machine that became inoperable during her shift, for which she admitted fault in a conversation with a supervisor and again in her deposition. Number two, what I just discussed, failing to run the required number of machines during a shift, for which she admitted fault in a conversation with a supervisor. And number three, failing to segregate plastic cut-off rings for recycling, for which she admitted fault in a conversation with a supervisor. Appellant argues that Reichel was not disciplined similarly to Ms. Reed. However, that's simply not the case. Mr. Reichel testified that when he committed the same infraction of ring mixing, he was written up. To speak to the allegation that Mr. Reichel and Ms. Reed shared 100% responsibility of the ring room, but that if Ms. Reed claimed responsibility, then she would be disciplined, whereas Mr. Reichel would not, the record does not support that characterization in the slightest. As Mr. Reichel and Mr. Yuckel both testified, Mr. Reichel and Ms. Reed worked together in the rotary cam department. There are three layers, there's three floors, pardon me. The machines are on the middle floor. The first floor is one area and the third floor is another. On the first floor there is a ring room. That is where shotgun shell cut-offs go to be recycled. Employees are required to keep the different colors separated so that they can be recycled and reused. Mixing the colors brings them out of spec. Mr. Yuckel testified and Mr. Reichel confirmed that Ms. Reed and Mr. Reichel both agreed that one of them would be responsible for the first floor, the other would be responsible for, I'm sorry, one would be responsible for the first floor where the ring room was, where the mixing event took place. That was Ms. Reed on the night in question. The other would be responsible for the third floor. This was to prevent them from running into each other. So when Mr. Yuckel asked Mr. Reichel and Ms. Reed who was responsible for the ring room on the night in question, Ms. Reed accepted responsibility. She said, I was in the ring room, Reichel was not. So Yuckel's statement was not that it's 100% responsibility on Ms. Reed when they shared 50-50 responsibility of the entire floor. It's that he would have written up both Mr. Reichel and Ms. Reed had Ms. Reed not claimed that she was the only one in charge of the ring room on the night in question. The overlying theme here is that there's no evidence in the record tying Appellant's termination from employment or her complaint of co-worker conduct to discriminatory or retaliatory intent or to rebut the legitimate business reasons for Plaintiff's termination. Plaintiff does not allege that she ever heard anyone, her co-workers or her supervisors, make any sort of complaint about her race. All of her reports were investigated. Mr. Yuckel testified that he frequently interacted with HR representative Beth Ellis in investigating her complaints. And the fact of the matter, Your Honors, is that she committed three severe policy violations in the two weeks before her termination. If there are no any additional questions, I'll yield the rest of my time. So you don't count the sleeping as one of the three? No, Your Honor, that occurred in April of 2023. She was not terminated until October of 2023, six months later. So the supervisors did not rely on the sleeping write-up in determining to terminate her employment. I see. Well, is that another response then to the point about Reichel sleeping? If you're saying the employer didn't even rely on sleeping? Yes, Your Honor, that does go to the allegation that Reichel had been sleeping. And again, the company was not aware he had been sleeping, but overall her sleeping write-up was not considered in the decision to terminate her employment. Okay, thank you for your argument. Thank you. And I think Mr. Shackelford used all your time, so we'll submit the case as argued and file an opinion in due course.